**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**NORTHERN DIVISION**

| | |
|---|---|
| **CRYSTAL HALL**, <br>902 Enclave Circle,<br>Nashville, Tennessee, 37211,<br><br>*individually and on behalf of all others similarly situated,*<br><br>Plaintiff,<br><br>v.<br><br>**ANNE ARUNDEL DERMATOLOGY, P.A,** 1306 Concourse Drive, Suite 201, Linthicum Heights, Anne Arundel County, Maryland, 21090<br><br>Defendant. | Case No. 1:25-cv-02322<br><br>JURY TRIAL DEMANDED |

## CLASS ACTION COMPLAINT

Plaintiff Crystal Hall ("Plaintiff"), individually and on behalf of all others similarly situated (collectively, "Class Members"), by and through the undersigned attorneys, bring this Class Action Complaint against Defendant Anne Arundel Dermatology, P.A., ("AAD" or "Defendant"), and alleging as follows, based upon information and belief and investigation of counsel, except as to the allegations specifically pertaining to them, which is based on personal knowledge:

## NATURE OF THE CASE

1. Plaintiff brings this class action lawsuit against Defendant for its failure to properly secure and safeguard Plaintiff's and other similarly situated persons who entrusted Defendant with sensitive Personally Identifiable Information ("PII") and Protected Health Information ("PHI") (collectively "Private Information") that was impacted in a data breach that Defendant experienced between February 14, 2025 and May 13, 2025.

2. Defendant is "[o]ne of the largest and most well-established dermatology practices in the Mid-Atlantic and Southeastern states."[1] It "specializes in general, surgical, and cosmetic dermatology"[2] and is headquartered in Linthicum Heights, Maryland.[3]

3. As part of its business, and to generate profit, Defendant obtains and stores Plaintiff's and Class Members' Private Information.

4. The Notice of Data Breach indicates that an unauthorized third party intruded on certain of Defendant's systems between February 14, 2025, and May 13, 2025. (the "Data Breach") The Notice of Data Breach also states that Defendant "performed an assessment of these data files and determined, on May 20, 2025, that some of the files contained certain personal information when the unauthorized third party had access to them."[4]

5. According to Defendant's notice, the Private Information affected included "date of birth, patient ID, medical record number, health history, and insurance information."[5]

6. By taking possession and control of Plaintiffs' and Class Members' Private Information, Defendant assumed a duty to securely store and protect Plaintiffs' and Class Members' Private Information.

7. Defendant breached this duty and betrayed Plaintiffs' and Class Members' trust by failing to properly safeguard and protect their Private Information, thus enabling cybercriminals to access, acquire, appropriate, compromise, disclose, encumber, exfiltrate, release, steal, misuse, and/or view it.

8. Due to Defendant's data security failures which resulted in the Data Breach,

---

[1] https://aadermatology.com/ (last visited on July 14, 2025) (Emphasis omitted).
[2] *Id.*
[3] Plaintiff Hall's Notice of Data Breach, attached as **Exhibit A.**
[4] *Id.*
[5] *Id.*

cybercriminals were able to target Defendant's computer systems and access Plaintiffs' and Class Members' highly sensitive PII and PHI. As a result of this Data Breach, Plaintiffs' and Class Members' Private Information remains in the hands of those cybercriminals.

9. Though Defendant has not revealed the vulnerabilities that the cybercriminals exploited, such that Plaintiff cannot allege those specific details with discovery, the known facts make clear that Defendant's cybersecurity posture was woefully inadequate.

10. For example, although Defendant's notice is silent on when Defendant discovered the Data Breach, according to Defendant's notice, the cybercriminals had access to Defendant's systems for as long ***as three months*** before Defendant realized cybercriminals had infiltrated its systems.[6] In other words, these cybercriminals were able to look for a way in to Defendant's information system; exploit that vulnerability and gain access to Defendant's information system; perform the necessary reconnaissance measures required for it to know where Defendant stored these valuable files; likely perform measures like installing additional malware that require administrative privileges (as these steps are standard for such hacker groups); all without being caught.

11. These measures are noisy and would have been identified as malicious activity if Defendant had implemented any serious systems designed to identify malicious activity—such as endpoint detection and response, extended detection and response, intrusion detection systems, anomaly detection systems, or centralized alerting systems.

12. Defendant's misconduct, including failing to implement adequate and reasonable measures to protect Plaintiffs' and Class Members' Private Information, failing to timely detect the Data Breach, failing to take adequate steps to prevent and stop the Data Breach, failing to

---

[6] *Id.*

disclose the material facts that it did not have adequate security practices in place to safeguard the Private Information, and failing to provide timely and adequate notice of the Data Breach – caused substantial harm and injuries to Plaintiffs and Class Members across the United States.

13. Due to Defendant's negligence and failures, cybercriminals accessed everything they need to commit personal identity theft and wreak havoc on the financial and personal lives of thousands of individuals, for decades to come. For example, Plaintiff and Class Members are now at a significantly increased and certainly impending risk of fraud, identity theft, misappropriation of health insurance benefits, intrusion of their health privacy, and similar forms of criminal mischief, and such risk may last for the rest of their lives. Consequently, Plaintiff must devote substantially more time, money, and energy to protect themselves, to the extent possible, from these crimes.

14. Plaintiff brings this class action lawsuit to hold Defendant responsible for its grossly negligent—indeed, reckless—failure to use statutorily required or reasonable industry cybersecurity measures to protect Class Members' Private Information.

15. Plaintiff brings this action individually and on behalf of the Class and seeks actual damages and restitution. Plaintiff also seeks declaratory and injunctive relief, including significant improvements to Defendant's data security systems and protocols, future annual audits, Defendant-funded long-term credit monitoring services, and other remedies as the Court sees necessary and proper.

## JURISDICTION AND VENUE

16. The Class Action Fairness Act (CAFA) confers diversity jurisdiction to a class action where (1) the "matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs," and (2) "*any* member of a class of Plaintiffs is a citizen of a State different

from any defendant." 28 U.S.C. § 1332(d)(2) (emphasis added).

17. This Court has diversity jurisdiction over this action under CAFA, 28 U.S.C. § 1332(d), because this is a class action consisting of more than 100 class members, the amount in controversy exceeds $5,000,000, exclusive of interest and costs, and at least one member of the Class—including Plaintiff Hall—is a citizen of a State that differs from any Defendant.

18. This Court has personal jurisdiction over the parties in this case. Defendant conducts business in this District and is a citizen of this District by virtue of having its principal place of business located in this District.

19. Venue is proper in this District under 28 U.S.C. §1391(b) because AAD and/or its parents or affiliates are headquartered in this District and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

## PARTIES

20. Plaintiff Crystal Hall is a citizen and resident of Nashville, Tennessee. Plaintiff was notified of the Data Breach and of the impact to her PHI/PII via letter from Defendant.

21. Defendant is a Maryland corporation, with its principal place of business located at 1306 Concourse Drive, Suite 201, Linthicum Heights, Maryland, 21090. Defendant is located in Anne Arundel County, Maryland.

## FACTUAL BACKGROUND

### A. Defendant Anne Arundel Dermatology, P.A.

22. Defendant is a dermatology practice group with over 60 locations across the Mid-Atlantic and Southeastern regions of the United States.

23. In order to provide services to patients, Defendant accumulates highly sensitive Private Information of its patients. In collecting and maintaining its patients' Private Information,

Defendant agreed it would safeguard the data in accordance with state law and federal law. After all, Plaintiff and Class Members themselves took reasonable steps to secure their Private Information.

24. Defendant understood the need to protect its patients' Private Information and prioritize its data security, and indeed, promises to safeguard such information via its Notice of Privacy Practices.[7]

25. Despite recognizing its duty to do so, on information and belief, Defendant has not implemented reasonable cybersecurity safeguards or policies to protect the PII/PHI of its patients, or trained its IT or data security employees to prevent, detect, and stop breaches of its systems. As a result, Defendant leaves significant vulnerabilities in its systems for cybercriminals to exploit and gain access to patients' PII/PHI.

**Defendant's Data Breach Was Imminently Foreseeable.**

26. Defendant's data security obligations were particularly important given the substantial increase in cyber-attacks and/or data breaches targeting institutions that collect and store Private Information, like Defendant, preceding the date of the Data Breach, especially healthcare companies.

27. Data thieves regularly target institutions like Defendant due to the highly sensitive information in their custody. Defendant knew and understood that unprotected Private Information is valuable and highly sought after by criminal parties who seek to illegally monetize that Private Information through unauthorized access.

28. In 2021, a record 1,862 data breaches occurred, resulting in approximately

[7] https://aadermatology.com/hipaa-privacy-notice/ (last visited July 16, 2025).

293,927,708 sensitive records being exposed, a 68% increase from 2020.[8] In light of recent high profile data breaches at other industry leading companies, including, Microsoft (250 million records, December 2019), Wattpad (268 million records, June 2020), Facebook (267 million users, April 2020), Estee Lauder (440 million records, January 2020), Whisper (900 million records, March 2020), and Advanced Info Service (8.3 billion records, May 2020), Defendant knew or should have known that the PII it collected and maintained would be targeted by cybercriminals.

29. As a custodian of PII, Defendant knew, or should have known, the importance of safeguarding the PII entrusted to it by Plaintiff and Class Members, and of the foreseeable consequences if its data security systems were breached, including the significant costs imposed on Plaintiff and Class Members because of a breach.

30. Despite the prevalence of public announcements of data breach and data security compromises, Defendant failed to take appropriate steps to protect the Private Information of Plaintiff and Class Members from being compromised.

31. Defendant was, or should have been, fully aware of the unique type and the significant volume of data in its systems, amounting to potentially thousands of individuals' detailed Private Information, and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

32. Indeed, cyberattacks against the healthcare industry have become increasingly common for over ten years, with the FBI warning as early as 2011 that cybercriminals were "advancing their abilities to attack a system remotely" and "[o]nce a system is compromised, cyber criminals will use their accesses to obtain PII." The FBI further warned that that "the increasing

---

[8] *See* Identity Theft Res. Ctr., *2021 Data Breach Annual Report*, at 6 (Jan. 2022), https://notified.idtheftcenter.org/s/.

sophistication of cyber criminals will no doubt lead to an escalation in cybercrime."[9]

33. Cyberattacks on medical systems and healthcare and healthcare adjacent companies like Defendant have become so notorious that the FBI and U.S. Secret Service have issued a warning to potential targets, so they are aware of, and prepared for, a potential attack. As one report explained, "[e]ntities like smaller municipalities and hospitals are attractive . . . because they often have lesser IT defenses and a high incentive to regain access to their data quickly."[10]

34. In fact, many high-profile ransomware attacks have occurred in healthcare and healthcare adjacent companies, with an estimated that nearly half of all ransomware attacks being carried out are on healthcare companies, and with 85% of those attacks being ransomware like the one occurring here.[11]

35. Therefore, the increase in such attacks, and the attendant risk of future attacks, was widely known to the public and to anyone in Defendant's industry, including Defendant.The injuries to Plaintiff and Class Members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for the Private Information of Plaintiff and Class Members.

36. The ramifications of Defendant's failure to keep secure the Private Information of Plaintiff and Class Members are long lasting and severe. Once PII is stolen, fraudulent use of that information and damage to victims may continue for years.

---

[9] Gordon M. Snow Statement, FBI https://archives.fbi.gov/archives/news/testimony/cyber-security-threats-to-the-financial-sector.

[10] *Secret Service Warn of Targeted*, LAW360, https://www.law360.com/articles/1220974/fbi-secret-service-warn-of-targeted-ransomware.

[11] *Ransomware explained*, CSO, https://www.csoonline.com/article/563507/what-is-ransomware-how-it-works-and-how-to-remove-it.html.

**Value of Personally Identifiable Information.**

37. The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[12] The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[13]

38. The Private Information of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials.[14]

39. For example, PII can be sold at a price ranging from $40 to $200.[15] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[16]

40. Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a typical retailer data breach because, there, victims can cancel or close credit and debit card accounts. The information compromised in this Data Breach—including Social Security number—is impossible

---

[12] 17 C.F.R. § 248.201 (2013).
[13] *Id.*
[14] *Your personal data is for sale on the dark web. Here's how much it costs,* DIGITAL TRENDS, Oct. 16, 2019, https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/.
[15] Brian Stack, *Here's How Much Your Personal Information Is Selling for on the Dark Web*, EXPERIAN (Dec. 6, 2017), https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web.
[16] *In the Dark*, VPNOVERVIEW, 2019, https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/.

to "close" and difficult, if not impossible, to change.

41. This data demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information . . . [is] worth more than 10x on the black market."[17]

42. The greater efficiency of electronic health records brings the risk of privacy breaches. These electronic health records contain a lot of sensitive information (e.g., patient data, patient diagnosis, lab results, medications, prescriptions, treatment plans, etc.) that is valuable to cybercriminals. One patient's complete record can be sold for hundreds of dollars on the dark web. As such, Private Information is a valuable commodity for which a "cyber black market" exists where criminals openly post stolen payment card numbers, Social Security numbers, and other personal information on several underground internet websites. Unsurprisingly, the health care industry is at high risk and is acutely affected by cyberattacks, like the Data Breach here.

43. The fraudulent activity resulting from the Data Breach may not come to light for years. There may be a time lag between when harm occurs versus when it is discovered, and also between when PII is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

44. [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from

[17] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, (Feb. 6, 2015), https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html.

data breaches cannot necessarily rule out all future harm.[18]

**Defendant Failed to Comply with HIPAA Requirements**

45. Federal law, among other sources, dictates special care due to sensitive personal medical information. For example, the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") requires healthcare providers and their business associates to take substantive measures to protect against the unauthorized access or disclosure of PHI, including but not limited to: (a) ensuring the confidentiality, integrity, and availability of PHI created, received, maintained, and transmitted; (b) preemptively identifying and protecting against reasonably anticipated threats to the security or integrity of PHI; (c) protecting against reasonably anticipated and foreseeable unauthorized uses or disclosures of PHI; (d) putting in place the required administrative and technical protections for PHI; (e) implementing data security policies and procedures to prevent, detect, contain, and remedy security breaches; and (f) effectively training and certifying their workforce concerning proper safeguards for PHI.

46. Defendant is a covered entity under HIPAA (45 C.F.R. § 160.102) and is required to comply with the HIPAA Privacy Rule and Security Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C.

47. Defendant is subject to the rules and regulations for safeguarding electronic forms of medical information pursuant to the Health Information Technology Act ("HITECH"). *See* 42 U.S.C. § 17921, 45 C.F.R. § 160.103.

---

[18] *Report to Congressional Requesters*, GAO, at 29 (June 2007), https://www.gao.gov/assets/gao-07-737.pdf.

48. HIPAA's Privacy Rule or Standards for Privacy of Individually Identifiable Health Information establishes national standards for the protection of health information.

49. HIPAA's Privacy Rule or Security Standards for the Protection of Electronic Protected Health Information establishes a national set of security standards for protecting health information that is kept or transferred in electronic form.

50. HIPAA requires "comply[iance] with the applicable standards, implementation specifications, and requirements" of HIPAA "with respect to electronic protected health information." 45 C.F.R. § 164.302.

51. "Electronic protected health information" is "individually identifiable health information … that is (i) transmitted by electronic media; maintained in electronic media." 45 C.F.R. § 160.103.

52. HIPAA's Security Rule requires defendants to do the following:

- Ensure the confidentiality, integrity, and availability of all electronic protected health information the covered entity or business associate creates, receives, maintains, or transmits;
- Protect against any reasonably anticipated threats or hazards to the security or integrity of such information;
- Protect against any reasonably anticipated uses or disclosures of such information that are not permitted; and
- Ensure compliance by its workforce.

53. HIPAA also requires Defendant to "review and modify the security measures implemented . . . as needed to continue provision of reasonable and appropriate protection of electronic protected health information." 45 C.F.R. § 164.306(e). Additionally, Defendant is required under HIPAA to "[i]implement technical policies and procedures for electronic

information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights." 45 C.F.R. § 164.312(a)(1).

54. HIPAA and HITECH also obligated Defendant to implement policies and procedures to prevent, detect, contain, and correct security violations, and to protect against uses or disclosures of electronic protected health information that are reasonably anticipated but not permitted by the privacy rules. *See* 45 C.F.R. § 164.306(a)(1) and § 164.306(a)(3); *see also* 42 U.S.C. §17902.

55. The HIPAA Breach Notification Rule, 45 C.F.R. §§ 164.400–414, also requires Defendant to provide notice of the Data Breach to each affected individual "without unreasonable delay and in no case later than 60 days following discovery of the breach."

56. HIPAA requires a covered entity to have and apply appropriate sanctions against members of its workforce who fail to comply with the privacy policies and procedures of the covered entity or the requirements of 45 C.F.R. Pt. 164, Subparts D or E. *See* 45 C.F.R. § 164.530(e). HIPAA requires a covered entity to mitigate, to the extent practicable, any harmful effect that is known to the covered entity of a use or disclosure of protected health information in violation of its policies and procedures or the requirements of 45 C.F.R. Part 164, Subpart E by the covered entity or its business associate. *See* 45 C.F.R. § 164.530(f).

57. HIPAA also requires the Office of Civil Rights ("OCR"), within the Department of Health and Human Services ("HHS"), to issue annual guidance documents on the provisions in the HIPAA Security Rule. *See* 45 C.F.R. §§ 164.302–164.318. For example, "HHS has developed guidance and tools to assist HIPAA covered entities in identifying and implementing the most cost effective and appropriate administrative, physical, and technical safeguards to protect the

confidentiality, integrity, and availability of e-PHI and comply with the risk analysis requirements of the Security Rule." US Department of Health & Human Services, Security Rule Guidance Material. The list of resources includes a link to guidelines set by the National Institute of Standards and Technology (NIST), which OCR says "represent the industry standard for good business practices with respect to standards for securing e-PHI." US Department of Health & Human Services, Guidance on Risk Analysis.

58. Defendant was at all times fully aware of its HIPAA obligations to protect the PHI of consumers yet failed to comply with such obligations. Defendant was also aware of the significant repercussions that would result from its failure to do so. Accordingly, Defendant's conduct was particularly unreasonable given the nature and amount of PHI it obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiffs and the Class.

**Defendant Failed to Comply with FTC Guidelines.**

59. The FTC has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision making. Indeed, the FTC has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of Section 5 of the FTCA, 15 U.S.C. § 45. *See, e.g., FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015).

60. In October 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established cybersecurity guidelines for businesses. The guidelines note that businesses should protect the personal consumer information they keep, properly dispose of personal information that is no longer needed, encrypt information stored on computer

networks, understand their network's vulnerabilities, and implement policies to correct any security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs, monitor all incoming traffic for activity indicating someone is attempting to hack into the system, watch for large amounts of data being transmitted from the system, and have a response plan ready in the event of a breach.

61. The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction, limit access to sensitive data, require complex passwords to be used on networks, use industry-tested methods for security, monitor the network for suspicious activity, and verify that third-party service providers have implemented reasonable security measures.

62. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect consumer data by treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by the FTCA. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

63. As evidenced by the Data Breach, Defendant failed to properly implement basic data security practices and failed to audit, monitor, or ensure the integrity of its data security practices, or to appropriately prepare to face a data breach and respond to it in a timely manner. Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to Plaintiff's and Class Members' PII constitutes an unfair act or practice prohibited by Section 5 of the FTC Act.

64. Defendant was at all times fully aware of its obligation to protect the PII of consumers under the FTCA yet failed to comply with such obligations. Defendant was also aware

of the significant repercussions that would result from its failure to do so. Accordingly, Defendant's conduct was particularly unreasonable given the nature and amount of PII it obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiff and the Class.

**Defendant Failed to Comply with Industry Standards.**

65. Healthcare organizations are particularly targeted by cybersecurity attacks, and so they are expected to prepare and implement reasonable cybersecurity measures, including tools necessary to timely identify malicious activity.

66. Some industry best practices that should be implemented by institutions dealing with sensitive Private Information, like Defendant, include, but are not limited to educating all employees, strong password requirements, multilayer security including firewalls, anti-virus and anti-malware software, encryption, multi-factor authentication, backing up data, and limiting which employees can access sensitive data. As evidenced by the Data Breach, Defendant failed to follow some or all these industry best practices.

67. Other best cybersecurity practices that are standard at large institutions that store PII include: installing appropriate malware detection software; monitoring and limiting network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protecting physical security systems; and training staff regarding these points. As evidenced by the Data Breach and Defendants failure to understand how the Data Breach occurred, Defendant failed to follow these cybersecurity best practices.

68. Defendant failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 2.0 (including without limitation

PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness. Defendant failed to comply with these accepted standards, thereby permitting the Data Breach to occur.

**Common Injuries & Damages**

69. Because of Defendant's ineffective and inadequate data security practices, the Data Breach, and the foreseeable consequences of PII ending up in the possession of criminals, the risk of identity theft to the Plaintiff and Class Members has materialized and is imminent, and Plaintiff and Class Members have all sustained actual injuries and damages, including: (a) invasion of privacy; (b) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft risk; (c) the loss of benefit of the bargain (price premium damages); (d) diminution of value of their PII; (e) invasion of privacy; and (f) the continued risk to their PII, which remains in the possession of Defendant, and which is subject to further breaches, so long as Defendant fails to undertake appropriate and adequate measures to protect Plaintiff's and Class Members' PII.

***Plaintiff Crystal Hall's Experience***

70. Plaintiff Hall is a former customer of Defendant. To obtain the services sold by Defendant, she was required to provide Defendant with her Private Information.

71. At all times relevant to this Complaint and Defendant stored and Defendant stored and handled her Private Information as a result of her dealings with Defendant. Plaintiff is a victim of the Data Breach.

72. On or about July 15, 2025, Plaintiff Hall was notified of the Data Breach and of the

impact to her PHI/PII via letter from Defendant.

73. Plaintiff Hall is careful to protect her Private Information. She is very careful about sharing her sensitive Private Information. She stores any documents containing her Private Information in a safe and secure location and has never knowingly transmitted unencrypted sensitive Private Information over the Internet or any other unsecured source.

74. Plaintiff learned of the Data Breach after reviewing the Notice Letter from Defendant. *See* Ex. A. According to the Notice Letter, the Data Breach affected Plaintiff's Private Information including Plaintiff's date of birth, patient ID, medical record number, health history, and insurance information.

75. As a result of the Data Breach, Plaintiff Hall has made reasonable efforts to mitigate the impact of the Data Breach, including expending time to check her bills and accounts to make sure they were correct, which time she would not have been required to spend on such tasks but for the Data Breach. Plaintiff has spent significant time dealing with the Data Breach, valuable time she otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

76. As a result of the Data Breach, Plaintiff Hall fears for her personal financial security and uncertainty over what medical information was revealed in the Data Breach. She is experiencing feelings of anxiety, sleep disruption, stress, and fear because of the Data Breach. This goes far beyond allegations of mere worry or inconvenience; it is exactly the sort of injury and harm to a Data Breach victim that is contemplated and addressed by law.

77. As a result of the Data Breach, Plaintiff Hall anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

78. Additionally, Plaintiff has experienced a significant increase in spam phone calls

since the Data Breach.

79. As a result of Defendant's inadequate data security practices and the resulting Data Breach, Plaintiff Hall faces a present and continuing risk of identity theft for her lifetime.

80. Plaintiff Hall has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains in Defendant's possession, is protected and safeguarded from future cyberattacks.

**Cyber Criminals Will Use Plaintiffs' and Class Members' Private Information to Defraud Them**

81. Plaintiff's and Class Members' Private Information is of great value to hackers and cyber criminals, and the data stolen in the Data Breach has been used and will continue to be used in a variety of sordid ways for criminals to exploit Plaintiffs and the Class Members and to profit off their misfortune.

82. Each year, identity theft causes tens of billions of dollars of losses to victims in the United States.[19] For example, with the Private Information stolen in the Data Breach, identity thieves can open financial accounts, apply for credit, collect government benefits, commit crimes, create false driver's licenses and other forms of identification and sell them to other criminals or undocumented immigrants, steal benefits, give breach victims' names to police during arrests, and many other harmful forms of identity theft.[20] These criminal activities have and will result in devastating financial and personal losses to Plaintiffs and Class Members.

83. Private Information is such a valuable commodity to identity thieves that once it

---

[19] Insurance Info. Inst., *Facts + Statistics: Identity Theft and Cybercrime*, https://www.iii.org/fact-statistic/facts-statistics-identity-theft-and-cybercrime (discussing Javelin Strategy & Research's report "2018 Identity Fraud: Fraud Enters a New Era of Complexity").

[20] John Egan, *What Should I Do If My Driver's License Number is Stolen* (June 13, 2024), https://www.experian.com/blogs/ask-experian/what-should-i-do-if-my-drivers-license-number-is-stolen/.

has been compromised, criminals will use it and trade the information on the cyber black-market for years.[21]

84. Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because there, victims can cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change—including Plaintiff's health history.

85. This data demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information and Social Security numbers are worth more than 10x on the black market."[22]

86. These risks are both certainly impending and substantial. As the FTC has reported, if hackers get access to personally identifiable information, they will use it.[23]

87. Hackers may not use the accessed information right away. According to the U.S. Government Accountability Office, which conducted a study regarding data breaches:

> [I]n some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[24]

---

[21] U.S. Gov't Accountability Office, *Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown*, (July 5, 2007), https://www.gao.gov/products/gao-07-737.

[22] Tim Greene, *Anthem Hack: Private Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, (Feb. 6, 2015), https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x- price-of-stolen-credit-card-numbers.html.

[23] Ari Lazarus, *How fast will identity thieves use stolen info?*, (May 24, 2017), https://www.consumer.ftc.gov/blog/2017/05/how-fast-will-identity-thieves-use-stolen-info.

[24] U.S. Gov't Accountability Office, *Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown*, (July 5, 2007),

88. As described above, identity theft victims must spend countless hours and large amounts of money repairing the impact to their credit.[25]

89. As a direct and proximate result of the Data Breach, Plaintiff and the Class have suffered, and have been placed at an imminent, immediate, and continuing increased risk of suffering, harm from fraud and identity theft. Plaintiff and the Class must now take the time and effort and spend the money to mitigate the actual and potential impact of the Data Breach on their everyday lives, including purchasing identity theft and credit monitoring services, placing "freezes" and "alerts" with credit reporting agencies, contacting their financial institutions, healthcare providers, closing or modifying financial accounts, and closely reviewing and monitoring bank accounts, credit reports, and health insurance account information for unauthorized activity for years to come.

90. As a direct and proximate result of Defendant's misconduct, Plaintiffs and the Class have suffered and will continue to suffer injuries, including but not limited to: (a) continued risk to their PII/PHI, which remains in Defendant's possession and is thus at risk of further breaches as along as Defendant fails to implement adequate data security measures and training to protect it; (b) invasion of privacy; (c) the loss of benefit of the bargain for money paid and information provided to Defendant; and (d) loss of time and productivity incurred mitigating the increased risk and imminent threat of identify theft.

**Defendant Could Have Prevented the Data Breach.**

91. It is important to note that that data breaches are preventable.[26] As Lucy Thompson

---

https://www.gao.gov/products/gao-07-737.

[25] Fed. Trade Comm'n, *Guide for Assisting Identity Theft Victims*, 4 (Sept. 2013), http://www.consumer.ftc.gov/articles/pdf-0119-guide-assisting-id-theft-victims.pdf.

[26] Lucy L. Thompson, *Despite the Alarming Trends, Data Breaches Are Preventable*, in DATA

wrote in the DATA BREACH AND ENCRYPTION HANDBOOK, "[i]n almost all cases, the data breaches that occurred could have been prevented by proper planning and the correct design and implementation of appropriate security solutions."[27] she added that "[o]rganizations that collect, use, store, and share sensitive personal data must accept responsibility for protecting the information and ensuring that it is not compromised . . . ."[28]

92. "Most of the reported data breaches are a result of lax security and the failure to create or enforce appropriate security policies, rules, and procedures … Appropriate information security controls, including encryption, must be implemented and enforced in a rigorous and disciplined manner so that a data breach never occurs."[29]

93. The FTC has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

94. In 2016, the FTC updated its publication, Protecting Private Information: A Guide for Business, which established cyber-security guidelines for businesses. The guidelines note that businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the

BREACH AND ENCRYPTION HANDBOOK (Lucy Thompson, ed., 2012).

[27] *Id.* at 17.

[28] *Id.* at 28.

[29] *Id.*

system; and have a response plan ready in the event of a breach.[30]

95. The FTC further recommends that companies not maintain Private Information longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

96. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

97. These FTC enforcement actions include actions against healthcare providers and partners like Defendant. *See, e.g., In the Matter of Labmd, Inc., A Corp*, 2016-2 Trade Cas. (CCH) ¶ 79708, 2016 WL 4128215, at *32 (MSNET July 28, 2016) ("[T]he Commission concludes that LabMD's data security practices were unreasonable and constitute an unfair act or practice in violation of Section 5 of the FTC Act.").

98. Defendant failed to properly implement basic data security practices, including those set forth by the FTC.

99. Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to customers' Private Information constitutes an unfair act or practice

---

[30] Fed. Trade Comm'n, *Protecting Private Information: A Guide for Business*, (Oct. 2016). https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.

prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

100. Defendant also failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 2.0 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

101. Defendant was entrusted with properly holding, safeguarding, and protecting against unlawful disclosure of Plaintiff's and Class Members' Private Information.

102. Defendant was at all times fully aware of its obligation to protect the Private Information of Plaintiff and Class Members. Defendant was also aware of the significant repercussions that would result from its failure to do so.

103. Defendant maintained the Private Information in a reckless manner. In particular, the Private Information was maintained and/or exchanged, unencrypted, in Defendant's systems and were maintained in a condition vulnerable to cyberattacks.

104. Defendant knew, or reasonably should have known, of the importance of safeguarding Private Information and of the foreseeable consequences that would occur if Plaintiff's and Class Members' Private Information was stolen, including the significant costs that would be placed on Plaintiff and Class Members as a result of a breach.

105. The mechanism of the cyberattack and potential for improper disclosure of Plaintiff's and Class Members' Private Information was a known risk to Defendant, and thus Defendant was on notice that failing to take necessary steps to secure Plaintiff's and Class Members' Private Information from those risks left that information in a dangerous condition.

106. Defendant disregarded the rights of Plaintiff and Class Members by, inter alia, (i) intentionally, willfully, recklessly, or negligently failing to take adequate and reasonable measures to ensure that its business email accounts were protected against unauthorized intrusions; (ii) failing to disclose that it did not have adequately robust security protocols and training practices in place to adequately safeguard Plaintiffs' and Class Members' Private Information; (iii) failing to take standard and reasonably available steps to prevent the Data Breach; (iv) concealing the existence and extent of the Data Breach for an unreasonable duration of time; and (v) failing to provide Plaintiffs and Class Members prompt and accurate notice of the Data Breach.

## CLASS ACTION ALLEGATIONS

107. Plaintiff incorporates by reference all allegations of the preceding paragraphs as though fully set forth herein.

108. Plaintiffs bring all counts, as set forth below, individually and as a Class action, pursuant to the provisions of the Fed. R. Civ. P. 23, on behalf of a Class defined as:

> All persons whose Private Information was compromised because of the Data Breach that is the subject of the Notice of Data Breach published by Defendant on or about July 15, 2025 (the "Class" or "Class Members").

109. This proposed Class definition is based on the information available to Plaintiff at this time. Plaintiff may modify the Class definition in an amended pleading or when they move for Class certification, as necessary to account for any newly learned or changed facts as the situation develops and discovery gets underway.

110. Excluded from the Class are Defendant, its subsidiaries and affiliates, officers and directors, any entity in which Defendant has a controlling interest, the legal representative, heirs, successors, or assigns of any such excluded party, the judicial officer(s) to whom this action is assigned, and the members of their immediate families.

111. The proposed Class meets the requirements of Fed. R. Civ. P. 23(a), (b)(1), (b)(2), (b)(3), and (c)(4).

112. **Numerosity** – Fed. R. Civ. P. 23(a)(1): Plaintiff is informed and believes, and thereon alleges, that there are at minimum, thousands of members of the Class described above. The exact size of the Class and the identities of the individual members are identifiable through Defendant's records, including but not limited to the files implicated in the Data Breach and the list of individuals Defendant sent notice letters to.

113. **Commonality** – Fed. R. Civ. P. 23(a)(2): This action involves questions of law and fact common to the Class. Such common questions include, but are not limited to:

a. Whether AAD had a duty to protect Plaintiff's and Class Members' PHI/PII;

b. Whether AAD was negligent in collecting and storing Plaintiff's and Class Members' PHI/PII, and breached its duties thereby;

c. Whether AAD was unjustly enriched;

d. Whether AAD entered a contract implied in fact with Plaintiff and the Class;

e. Whether AAD breached that contract by failing to adequately safeguard Plaintiff's and Class Members' PHI/PII;

f. Whether AAD breached its fiduciary duty to Plaintiff and the Class;

g. Whether AAD violated its own Privacy Practices;

h. Whether injunctive relief is appropriate and, if so, what injunctive relief is necessary to redress the imminent and currently ongoing harm faced by Plaintiff and members of the Class and the general public;

i. Whether Plaintiff and Class Members are entitled to damages as a result of AAD's wrongful conduct; and

j. Whether Plaintiff and Class Members are entitled to restitution as a result of AAD's wrongful conduct.

114. **Typicality** – Fed. R. Civ. P. 23(a)(3): Plaintiff's claims are typical of the claims of the members of the Class. Plaintiff's and Class Members' claims are based on the same legal theories and arise from the same unlawful and willful conduct. Plaintiff and members of the Class all had information stored in AAD's system, each having their PHI/PII exposed and/or accessed by an unauthorized third party.

115. **Adequacy of Representation** – Fed. R. Civ. P. 23(a)(3): Plaintiff is an adequate representative of the Class because their interests do not conflict with the interests of the other Class Members Plaintiff seeks to represent; Plaintiff has retained counsel competent and experienced in complex Class action litigation; Plaintiff intends to prosecute this action vigorously; and Plaintiff's counsel have adequate financial means to vigorously pursue this action and ensure the interests of the Class will not be harmed. Furthermore, the interests of the Class Members will be fairly and adequately protected and represented by Plaintiff and Plaintiff's counsel.

116. **Injunctive Relief**, Fed. R. Civ. P. 23(b)(2): Defendant has acted and/or refused to act on grounds that apply generally to the Class therefore making injunctive and/or declarative relief appropriate with respect to the Class under 23(b)(2).

117. **Superiority**, Fed. R. Civ. P. 23(b)(3): A Class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a Class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of

separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for AAD. In contrast, the conduct of this action as a Class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class member.

118. AAD has acted on grounds that apply generally to the Class as a whole, so that Class certification, injunctive relief, and corresponding declaratory relief are appropriate on a Class-wide basis.

119. Likewise, particular issues are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a. Whether AAD failed to timely and adequately notify the public of the Data Breach;

b. Whether AAD owed a legal duty to Plaintiff and the Class to exercise due care in collecting, storing, and safeguarding their PHI/PII;

c. Whether AAD's security measures to protect its data systems were reasonable in light of best practices recommended by data security experts;

d. Whether AAD's failure to institute adequate protective security measures amounted to negligence;

e. Whether AAD failed to take commercially reasonable steps to safeguard consumers' and employees' PHI/PII; and

f. Whether adherence to FTC data security recommendations, and measures recommended by data security experts would have reasonably prevented the Data Breach.

120. Finally, all members of the proposed Class are readily ascertainable. AAD has access to Class Members' names and addresses affected by the Data Breach. Class Members have already been preliminarily identified and sent notice of the Data Breach by Defendant.

## CAUSES OF ACTION

### COUNT I
### NEGLIGENCE
### (On Behalf of Plaintiffs and Class Members)

121. Plaintiff restates and realleges the allegations in the preceding paragraphs as if fully set forth herein.

122. Plaintiff and Class Memebrs entrusted their Private Information to Defendant on the premise and with the understanding that Defendant would safeguard their information, use their Private Information for medical and business purposes only, and/or not disclose their Private Information to unauthorized third parties.

123. By collecting and storing this data in Defendant's computer network and sharing it and using it for commercial gain, Defendant had a duty of care to use reasonable means to secure and safeguard its computer network—and Class Members' Private Information held within it—to prevent disclosure of the information, and to safeguard the information from theft. Defendant's duty included a responsibility to implement processes by which it could detect a breach of its security systems in a reasonably expeditious period and to give prompt notice to those affected in the case of a Data Breach.

124. Defendant owed a duty of care to Plaintiff and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that its systems and networks, and the personnel responsible for them, adequately protected the Private Information.

125. Defendant's duty of care to use reasonable security measures arose as a result of the special relationship that existed between Defendant and its patients, which is recognized by laws and regulations including but not limited to HIPAA, as well as common law. Defendant was in a position to ensure that its systems were sufficient to protect against the foreseeable risk of harm to Class Members from a Data Breach.

126. Defendant's duty to use reasonable security measures under HIPAA required Defendant to "reasonably protect" confidential data from "any intentional or unintentional use or disclosure" and to "have in place appropriate administrative, technical, and physical safeguards to protect the privacy of protected health information." 45 C.F.R. § 164.530(c)(1). Some or all of the healthcare, medical, and/or medical information at issue in this case constitutes "protected health information" within the meaning of HIPAA.

127. In addition, Defendant had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

128. Defendant's duty to use reasonable care in protecting confidential data arose not only because of the statutes and regulations described above, but also because Defendant is bound by industry standards to protect confidential Private Information.

129. Defendant breached its duties, and thus were negligent, by failing to use reasonable measures to protect Class Members' Private Information. The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

a. Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' Private Information;

b. Failing to adequately monitor the security of its networks and systems;

c. Failure to periodically ensure that its email system had plans in place to maintain reasonable data security safeguards;

d. Allowing unauthorized access to Class Members' Private Information;

e. Failing to detect in a timely manner that Class Members' Private Information had been compromised; and

f. Failing to timely notify Class Members about the Data Breach so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

130. It was foreseeable that Defendant's failure to use reasonable measures to protect Class Members' Private Information would result in injury to Class Members. Further, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches in the healthcare industry

131. It was therefore foreseeable that the failure to adequately safeguard Class Members' Private Information would result in one or more types of injuries to Class Members.

132. Moreover, though Defendant has not publicly identified the vulnerability or vulnerabilities that were exploited, its complete failure to identify the malicious activity—for as long as ***three months***—shows that Defendant failed to get even the basics right—tools designed to at least identify malicious activity. Defendant's failure to do even the basics constitutes gross negligence.

**COUNT TWO**
**BREACH OF IMPLIED CONTRACT**
**(On Behalf of Plaintiffs and Class Members)**

168. Plaintiff restates and realleges the allegations in the preceding paragraphs as if fully set forth herein.

169. Plaintiff and Class Members were required to provide Defendant with their Private

Information in order to receive dermatological care and treatment.

170. When Plaintiff and Class Members provided their Private Information to Defendant when seeking dermatological services, they entered into implied contracts in which Defendant agreed to comply with its statutory and common law duties to protect their Private Information and to timely notify them in the event of a Data Breach.

171. Based on Defendant's representations, legal obligations, and acceptance of Plaintiff's and the Class Members' Private Information, Defendant had an implied duty to safeguard their Private Information through the use of reasonable industry standards. This implied duty was reinforced by Defendant's representations in its Privacy Policy.

172. Defendant breached the implied contracts by failing to safeguard Plaintiff's and Class Members' Private Information and failing to provide them with timely and accurate notice of the Data Breach.

173. As a direct and proximate result of Defendant's breach of implied contract, Plaintiff and Class Members have suffered damages, including foreseeable consequential damages that Defendant knew about when it requested Plaintiffs' and the Class Members' Private Information.

174. Based on Defendant's representations, legal obligations, and acceptance of Plaintiffs' and the Class Members' Private Information, Defendant had an implied duty to safeguard their Private Information through the use of reasonable industry standards. This implied duty was reinforced by Defendant's representations in its privacy policy.

175. Defendant breached the implied contracts by failing to safeguard Plaintiff's and Class Members' Private Information and failing to provide them with timely and accurate notice of the Data Breach. Indeed, it took Defendant weeks to warn Plaintiff and Class Members of their imminent risk of identity theft. The vagueness of the breach notification also left Plaintiff and

Class Members unsure as to the extent of the information that was compromised.

176. As a direct and proximate result of Defendant's breach of implied contract, Plaintiff and Class Members have suffered damages, including foreseeable consequential damages that Defendant knew about when it requested Plaintiff's and the Class Members' Private Information.

**COUNT THREE**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiffs and Class Members)**

177. Plaintiff restates and realleges the allegations in the preceding paragraphs as if fully set forth herein.

178. Plaintiff and the Class bring this claim in the alternative to their claim for Breach of Implied Contract. (Count Two).

179. Plaintiff and Class Members conferred a benefit on AAD in the form of monies paid and profits to render certain services, a portion of which was intended to have been used by AAD for data security measures to secure Plaintiff's and Class Members' PHI/PII.

180. AAD enriched itself by saving the costs it reasonably should have expended on data security measures to secure Plaintiff's and Class Members' PHI/PII. Instead of providing a reasonable level of security that would have prevented the Data Breach, AAD chose to avoid its data security obligations at the expense of Plaintiff and Class Members by utilizing cheaper, ineffective security measures. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of AAD's failure to provide adequate security.

181. Under the principles of equity and good conscience, AAD should not be permitted to retain the full value of its profits resulting from its collection and storage of the Plaintiff's and Class Members' PHI/PII, because AAD failed to implement appropriate data management and security measures that are mandated by industry standards.

182. If Plaintiff and Class Members knew that AAD had not secured their PHI/PII, they would not have agreed to disclose their data to AAD's clients.

183. Defendant, by way of its affirmative actions and omissions, including its knowing violations of its express or implied contracts with the entities that collected Plaintiff's and the Class Members' Private Information, knowingly and deliberately enriched itself by saving the costs it reasonably and contractually should have expended on reasonable data privacy and security measures to secure Plaintiff's and Class Members' Private Information.

184. Instead of providing a reasonable level of security, training, and protocols that would have prevented the Data Breach, as described above and as is common industry practice among companies entrusted with similar Private Information, Defendant, upon information and belief, instead consciously and opportunistically calculated to increase its own profits at the expense of Plaintiff's and Class Members.

185. Defendant failed to implement—or adequately implement—data security practices, procedures, and programs to secure sensitive Private Information, including without limitation those industry standard data security practices, procedures, and programs discussed herein.

186. As a direct and proximate result of Defendant's decision to profit rather than provide adequate data security, Plaintiff and Class Members suffered and continue to suffer actual damages, including (i) the amount of the savings and costs Defendant reasonably and contractually should have expended on data security measures to secure Plaintiff's Private Information, (ii) time and expenses mitigating harms, (iii) diminished value of Private Information, (iv) loss of privacy, (v) harms as a result of identity theft; and (vi) an increased risk of future identity theft.

187. Defendant, upon information and belief, has therefore engaged in opportunistic and unethical conduct by profiting from conduct that it knew would create a significant and highly

likely risk of substantial and certainly impending harm to Plaintiff and the Class in direct violation of Plaintiffs' and Class Members' interests. As such, it would be inequitable, unconscionable, and unlawful to permit Defendant to retain the benefits it derived as a consequence of its wrongful conduct.

188. Accordingly, Plaintiff and the Class are entitled to relief in the form of restitution and disgorgement of all ill-gotten gains, which should be put into a common fund to be distributed to Plaintiff and the Class.

**COUNT FOUR**
**INVASION OF PRIVACY**
**(On Behalf of Plaintiffs and Class Members)**

189. Plaintiff restates and realleges the allegations in the preceding paragraphs as if fully set forth herein.

190. Plaintiff and Class Members took reasonable and appropriate steps to keep their Private Information confidential from the public.

191. Plaintiff's and Class Members' efforts to safeguard their own Private Information were successful, as their Private Information was not known to the public prior to the Data Breach.

192. Plaintiff and Class Members had a legitimate expectation of privacy to their Private Information and were entitled to the protection of this information against disclosure to unauthorized third parties.

193. Defendant owed a duty to its customers, including Plaintiff and the proposed Class Members, to keep their Private Information confidential.

194. The unauthorized release of Private Information is highly offensive to any reasonable person. Plaintiff's and Class Members' Private Information is not of legitimate concern to the public.

195. Defendant knew or should have known that Plaintiff's and Class Members' Private Information was private.By intentionally failing to keep Plaintiff's and Class Members' PII and PHI safe, and by intentionally misusing and/or disclosing said information to unauthorized parties for unauthorized use, Defendant intentionally invaded Plaintiff's and Class Members' privacy by:

a. Intentionally and substantially intruding into Plaintiff's and Class Members' private affairs in a manner that identifies Plaintiff and Class Members and that would be highly offensive and objectionable to an ordinary person;
b. Intentionally publicizing private facts about Plaintiff and Class Members, which is highly offensive and objectionable to an ordinary person; and
c. Intentionally causing anguish or suffering to Plaintiff and Class Members.

196. As the Restatement explains, as used throughout the Restatement of Torts, intent "has reference to the consequences of an act rather than the act itself." Restatement (Second) of Torts § 8A, cmt. A (1964). "Intent is not, however, limited to consequences which are desired. If the actor knows that the consequences are certain, or substantially certain, to result from his act, and still goes ahead, he is treated by the law as if he had in fact desired to produce the result." *Id.* cmt. B.

197. Indeed, given the foreseeability of the harms inherent in data breaches and the ubiquitous nature of data breaches, Defendant was substantially certain that its failure to implement reasonable cybersecurity standards would lead to an invasion of Plaintiff's privacy.

198. Defendant knew that an ordinary person in Plaintiff's or Class Members' position would consider the exposure of their PII and PHI to be highly offensive and objectionable.

199. Defendant invaded Plaintiff's and Class Members' right to privacy and intruded into Plaintiff's and Class Members' private affairs by intentionally misusing and/or disclosing their PII and PHI without their informed, voluntary, affirmative, and clear consent.

200. Moreover, given that stolen PII and PHI is then publicized and traded on the dark web and through Telegram channels, Defendant knew or was substantially certain that its failure

to implement reasonable cybersecurity safeguards would lead to the publication of Plaintiff's and the Class Members' PII and PHI to a large group of the public and/or to a large group of individuals who are in a special relationship with Plaintiff and the proposed Class Members, in that those individuals are exactly the type of people that Plaintiff and the Class Members have a special interest in ensuring their PII and PHI is kept confidential from given that those individuals are known identity thieves and fraudsters.

201. The conduct described above was at or directed at Plaintiff and the Class Members. As a proximate result of such intentional misuse and disclosures, Plaintiff's and Class Members' reasonable expectations of privacy in their PII was unduly frustrated and thwarted. Defendant's conduct amounted to a substantial and serious invasion of Plaintiff's and Class Members' protected privacy interests causing anguish and suffering such that an ordinary person would consider Defendant's intentional actions or inaction highly offensive and objectionable.

202. In failing to protect Plaintiff's and Class Members' PII, and in intentionally misusing and/or disclosing their PII, Defendant acted with intentional malice and oppression and in conscious disregard of Plaintiff's and Class Members' rights to have such information kept confidential and private. Plaintiff therefore, seeks an award of damages on behalf of themselves and the Class.

203. Unless and until enjoined, and restrained by order of this Court, Defendant's wrongful conduct will continue to cause great and irreparable injury to Plaintiff and Class Members in that Defendant's inadequate data security measures will likely result in additional data breaches. Plaintiff and Class Members have no adequate remedy at law for the injuries that they will sustain in that a judgment for monetary damages will not prevent further invasions of the Plaintiff's and Class Members' privacy by Defendant.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff and the Class pray for judgment against Defendant as follows:

a. An order certifying this action as a class action under Fed. R. Civ. P. 23, defining the Class as requested herein, appointing the undersigned as Class counsel, and finding that Plaintiffs are proper representatives of the Class requested herein;

b. A judgment in favor of Plaintiff and the Class awarding them appropriate monetary relief, including actual damages, restitution, attorney fees, expenses, costs, and such other and further relief as is just and proper.

c. An order providing injunctive and other equitable relief as necessary to protect the interests of the Class and the general public as requested herein, including, but not limited to:

    i. Ordering that Defendant engage third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

    ii. Ordering that Defendant engage third-party security auditors and internal personnel to run automated security monitoring;

    iii. Ordering that Defendant audit, test, and train its security personnel regarding any new or modified procedures;

    iv. Ordering that Defendant segment customer data by, among other things, creating firewalls and access controls so that if one area of Defendant's

systems is compromised, hackers cannot gain access to other portions of Defendant's systems;

v. Ordering that Defendant cease transmitting Private Information via unencrypted email;

vi. Ordering that Defendant cease storing Private Information in email accounts;

vii. Ordering that Defendant purge, delete, and destroy in a reasonably secure manner customer data not necessary for its provisions of services;

viii. Ordering that Defendant conduct regular database scanning and securing checks;

ix. Ordering that Defendant routinely and continually conduct internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach; and

x. Ordering Defendant to meaningfully educate its current, former, and prospective employees and subcontractors about the threats faced as a result of the loss of financial and personal information to third parties, as well as the steps they must take to protect against such occurrences;

d. An order requiring Defendant to pay the costs involved in notifying the Class Members about the judgment and administering the claims process;

e. A judgment in favor of Plaintiff and the Class awarding them pre-judgment and post-judgment interest, reasonable attorneys' fees, costs and expenses as allowable by law;

and

f. An award of such other and further relief as this Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on all issues so triable.

Respectfully Submitted:

/s/ *Zachary E. Howerton*
Zachary E. Howerton (Fed. Bar No. 20688)
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN PLLC**
223 Duke of Gloucester Street
Annapolis, MD 21401
Telephone: (410) 269-6620
Facsimile: (410) 269-1235
zhowerton@milberg.com

J. Gerard Stranch, IV*
Grayson Wells*
**STRANCH, JENNINGS & GARVEY, PLLC**
223 Rosa L. Parks Avenue, Suite 200
Nashville, TN 37203
Tel: (615) 254-8801
gstranch@stranchlaw.com
gwells@stranchlaw.com

***Pro Hac Vice Application Forthcoming***
***Counsel for Plaintiff and the Proposed Class***